606

Chas. Cohen et al., Copartners Trading as Cohen and Gordon, Appellees, v. Texas and New Orleans Railroad Company, Appellant.

Gen. No. 40,936.

Heard in the third division of this court for the first district at the October term, 1939.

Opinion filed February 14, 1940.

JOHN A. SHEEAN, of Chicago, for appellant.

GOLBUS & GOLBUS, of Chicago, for appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

Plaintiffs are copartners, engaged in the produce business in Chicago. Nathan Lerner, one of the partners, was in Sandia, Texas in May, 1934, where he purchased 396 bushel baskets of cucumbers. The cucumbers were delivered to the defendant at Sandia, Texas on May 16, 1934, and placed in PFE car 25578. The shipment was consigned to plaintiffs at Chicago. In May, 1935, he also purchased 465 bushel baskets of cucumbers from Tedford Brothers at Taft, Texas. These cucumbers were delivered to defendant at Aransas Pass, Texas on May 9, 1935, and were placed in PFE car 1931, and consigned to plaintiffs at Chicago. Lerner personally supervised the packing and grading of the cucumbers at the points of origin. The shipments were reconsigned to Milwaukee, Wisconsin. Uniform bills of lading were issued as to each shipment. On the reverse side of each bill of lading, under ''Contract Terms and Conditions,'' appears a requirement that as a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or the carrier issuing the bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property, and that suits shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim, or any part or parts thereof, specified in the notice. The bill of lading also provides that where claims are not filed or suits are not instituted thereon ''in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid.'' The cars proceeded from Chicago to Milwaukee via the Chicago, Milwaukee, St. Paul and Pacific Railroad. The shipments arrived at Milwaukee in a somewhat damaged condition, obviously due to the shifting of

the loads in transit. The railroad handling, exclusive of the shifting feature, was shown to have been good, the cars moving over great distances under proper service, as contemplated by the shipper's instructions, and transported between the points of origin and destination without any delay. On June 8, 1934, a duly authorized representative of plaintiffs presented in writing to the delivering carrier, Chicago, Milwaukee, St. Paul and Pacific Railroad, a document, entitled, "Loss and Damage Claim," addressed to the freight-claim agent of defendant at Houston, Texas, and to the freight-claim agent of the delivering carrier. The document bore file No. CG 7220, and read:

"You are hereby notified that car PFE 25578 shipped from Sandia, Tex. on or about 5-16-34 containing cukes arrived at Milwaukee, Wis. on or about 5-21-34 day of ——— 19— in damaged condition, caused by negligence and improper service of the said St. P. R. R. Co. and connecting carriers. This car of . . . when delivered to us here was found to be damaged as follows:

"Delayed–poor condition–rough handling–

"decline in market–improper vents

"allowance made a/c damaged condition.

"The total loss on the shipment is approximately $250.00, more or less for which we herewith file claim. Bill in detail, together with necessary documents, i. e. bill of lading, paid freight bill, etc. will be filed with you or the initial carrier which issued the bill of lading." The claim apparently was presented in duplicate, one copy going to the claim-agent of the originating carrier, and one going to the claim agent of the delivering carrier. This claim was not accompanied by any papers, such as bill of lading, freight receipt or invoice. On June 17, 1934, plaintiffs' agent received a written notice from the claim agent of the delivering carrier dated June 15, 1934. The claim agent stated

that the claim was recorded in his office as No. 29976–2, and read:

"Your claim under file CG–7220 relating to PFE 25578, moving in May, 1934.

"This account does not appear to be supported with any original documents or conclusive proof in support of your contention of carriers' liability, and under the circumstances we are forced to respectfully disallow the claim." There was correspondence between the claim agent of the originating carrier and plaintiffs' representative. On July 3, 1934, plaintiffs, by their agent, presented a claim against defendant, No. 17775. This claim was addressed to the freight-claim agent of defendant at Houston, Texas, and asked for $217.80. Attached to the claim was the original bill of lading, the original paid freight bill and the original invoice. On October 26, 1934, this claim agent returned the papers and offered the sum of $38.69 in settlement. The letter stated that the investigation conducted did not justify the payment of anything more than the amount proffered in settlement. On November 6, 1934, the same claim agent wrote that defendant would be glad to hold the claim pending the next visit of an adjuster to Chicago. On March 11, 1935, the claim agent stated that defendant could not pay more than the $38.69 previously offered. On June 24, 1935, the claim agent repeated the same statement. On October 15, 1936, plaintiffs filed their two-count statement of claim in the municipal court of Chicago. Count 1 sought $250 for damages to the shipment of cucumbers in PFE car 25578 from Sandia, Texas, to Milwaukee, Wisconsin, and count 2 asked a like sum for damages on account of the shipment of cucumbers in PFE car 1931 from Aransas Pass, Texas to Milwaukee, Wisconsin. Defendant filed an amended affidavit of merits. The affidavit asserted that as to car PFE 25578, the delivering carrier disallowed the claim on June 16, 1934; that the instant action was begun on October 15,

1936; that more than two years and one day had expired from the time the claim was declined until the action was instituted, and that, therefore, the action was barred under the applicable provisions of the Interstate Commerce Act and the bill of lading. The affidavit further denied that the carriers failed to promptly and safely transport the cucumbers, and denied the damage. The case was tried before the court without a jury, and resulted in a finding and judgment for the plaintiffs and against the defendant in the sum of $438.73. Apparently, the court allowed $217.80 on count 1, being PFE car 25578, and $220.93 on count 2, being PFE car 1931. At the close of plaintiffs' case, and also at the close of all the evidence, the defendant moved for findings in its favor, and after the findings, defendant moved for a new trial. All of the motions were overruled and the court entered judgment on the findings, to reverse which this appeal is prosecuted.

The first criticism leveled at the judgment is that the cause of action embraced in the first count was barred by virtue of the clause of the bill of lading, which requires that suit shall be instituted against any carrier only within two years and one day from the date when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim of any part or parts thereof specified in the notice. Plaintiffs contend that the suit was not barred because (1) no claim which could be declined was filed with the delivering carrier, and (2) there was no disallowance as contemplated by the Interstate Commerce Act and the bill of lading. It is well settled that an interstate carrier cannot legally waive any bill of lading provisions. Paragraph 1, sec. 3 of the Interstate Commerce Act (U. S. C. A., title 49, sec. 3) provides that:

"It shall be unlawful for any common carrier subject to the provisions of this Act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, associa-

tion, locality, port, port district, gateway, transit point, or any particular description of traffic in any respect whatsoever or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.'' Paragraph 1, sec. 10 of the same act (U. S. C. A., title 49, sec. 10) imposes severe penalties for violation of the act. The penalties were made severe for the obvious purpose of putting a stop to the vicious practice of rebating, which had become quite universal throughout the country. The United States Supreme Court has consistently construed both sections of the act in a manner to preclude any possibility of an interstate carrier favoring one patron as against another. The carrier cannot by any device or subterfuge, or under any pretense, no matter how plausible, take any step which might eventually lead to favoring one shipper or passenger as against another. The act is aimed not only at violations of tariff provisions, but is applicable to any service to be performed by the carrier as well as to any benefit accruing to the carrier by virtue of the shipping contract. To permit a railroad company to plead the statute of limitations as against some and to waive it as against others, would be to prefer some and discriminate against others. The prohibitions of the statute against unjust discrimination relate not only to inequality of charges, but also to giving of preferences by means of consent judgments, or the waiver of defenses open to the carrier. (*A. J. Phillips Co. v. Grand Trunk W. Ry. Co.*, 236 U. S. 662; *Southern Ry. Co. v. Prescott*, 240 U. S. 632; *Louisville & Nashville Ry. Co. v. Maxwell*, 237 U. S. 94; *Georgia, F. & A. R. Co. v. Blish Mill. Co.*, 241 U. S. 190; *Hart v. Oregon Short Line R. Co.*, 207 Ill. App. 290.) Plaintiffs concede that the action must be brought within two years and one day from the time

when notice in writing is given by the carrier to the claimant that the claim, or any part of it, has been disallowed. They assert, however, that the document sent to the claim agents of the initial carrier and delivering carrier on June 6, 1934, entitled, "Loss and Damage Claim," was not in fact intended to be a claim. The reason they give for such statement is that it was the custom of their representatives who had been handling such claims for the past 15 years, to forward a notice of claim on every car to the initial carrier and a copy to the delivering carrier; that no supporting papers were forwarded with the notice, and that although notice of claim was sent to the carriers on June 6, 1934, nevertheless, the claim was not filed until July 3, 1934, "when the claim base and supporting papers were forwarded to the freight claim agent of defendant, nothing further being sent to the C. M. & St. P." We are unable to agree with the contention of plaintiffs. The document which they sent to the carriers on June 6, 1934, is entitled "Loss and Damage Claim." It required the carriers to "kindly acknowledge receipt immediately inserting your claim number." It noted the claim number of claimant as file No. CG 7220. The initials undoubtedly stand for the trade name of plaintiffs, "Cohen & Gordon." The document gives the car number, the date and place of shipment, date and place of arrival, and concludes, "The total loss on the shipment is approximately $250.00 more or less for which we herewith file claim. Bill in detail, together with necessary documents, i. e. bill of lading, paid freight bill, etc. will be filed with you or the initial carrier which issued the bill of lading." It is quite apparent that the document constituted a claim. Joseph Golbus, who was the traffic manager associated with the attorney who presented the claim in behalf of plaintiffs, testified that the document marked "Loss and Damage Claim" was "a notice to stay the Statute of Limitations." He undoubt-

edly had in mind that part of the bill of lading which requires that as a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing the bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property. The carrier had a right to act on the claim at any time after it was received.

On the question as to whether the action was filed within two years and one day following disallowance of the claim, the reasons which impelled the carrier to disallow are immaterial. It undoubtedly was the duty of the carrier to give due consideration to the claim. At the time of disallowance the delivering carrier had the opportunity to be acquainted with all the facts, and there is nothing in the record that such carrier acted in an arbitrary or unreasonable manner in declining the claim. Plaintiffs, however, would not be in a position to go into the motives that actuated the carrier in declining the claim. They had a complete remedy by bringing action within two years and one day from the time such claim was declined. It is interesting to observe that the notice from the claim agent of the delivering carrier, dated June 15, 1934, concluded with the words, "we are forced to respectfully disallow the claim." The claim agent's notice declining the claim thus uses the same language as the bill of lading. Subsequent to the disallowance of the claim by the delivering carrier, defendant was powerless under the authorities, to waive the provisions of the bill of lading which placed a limitation on the time when the action could be commenced. It is interesting to observe that defendant declined the claim on October 26, 1934, on March 11, 1935, and finally on June 24, 1935. We are of the opinion that the carrier mentioned in the statutory provisions, as well as in the bill of lading, as the party to give the notice of declination, is any one of the carriers, whether the receiving or

the delivering road, or the line on which the damages occurred, and with which the notice of claim has been filed. As the claim was filed with the Chicago, Milwaukee, St. Paul & Pacific Railroad, the delivering line, the declination by that company was conclusive on the shipper. The delivering carrier in declining the claim, was acting within the scope of its authority as an agent of the other carriers, and was also acting by virtue of the provisions of the statutes and bills of lading. Mr. Joseph Golbus, a witness for plaintiffs, testified that the nature of the business with which he was connected for 12 years, was the presentation of claims against carriers for loss and damage of perishables, and that it was ''customary for the office when we get our files to send a notice to both the originating and destination carriers. The papers supporting a claim are not sent at the time of sending the notice. These papers include the original bill of lading and freight bill and possibly an inspection report and account sales. Usually when the claim papers are received by us they include the documents indicated. If not we write for them. When the papers are so received we file notice with both the destination and originating carrier.'' It is patent that a custom in the office of the attorney for the plaintiffs could not bind the carriers or change the law applicable to the situation. As the notice that the claim involving the cucumbers in car PFE 25578 was given on July 17, 1934, and the instant action was not commenced until September 15, 1936, it follows that the cause of action pleaded in count 1 of the statement of claim is barred by the limitation provision in the bill of lading.

As a second point, defendant argues that testimony introduced by plaintiffs to the effect that they sold the contents of PFE car 25578 to Rubenstein & Company at Milwaukee for $1.60 a bushel, was irrelevant, because no special damages were alleged in the statement of claim, and that such testimony was also in-

competent as there was no evidence of the notice of such sale having been given to the carriers prior to the delivery of the car at destination. The second point also involves the car for which damages are sought in the first count of the statement of claim. As we have held that the cause of action set out in that count is barred by the limitation provision of the bill of lading, it is unnecessary to discuss the second point.

Finally, defendant urges that "testimony to the effect that the market value of the entire car in each instance was adversely affected by virtue of the fact that certain physical damage had been shown to some of the cucumbers contained in a limited number of the baskets in the cars, was incompetent under the facts in the case, and there was no competent evidence in the record at the close of plaintiffs' case to justify the court in entering a judgment against the defendant as to either or both of the cars involved." As heretofore stated, it will be unnecessary to further consider the testimony relative to PFE car 25578.

The parties stipulated that PFE car 1931 arrived at Milwaukee at 1:30 a. m., May 13, 1935, was placed for unloading at 5:40 a. m., and the Milwaukee consignee notified of arrival at 6:00 a. m. on the same day; that unloading by consignee began at 7:20 a. m., May 14, 1935; that the shipment consisted of 465 bushel baskets of cucumbers. Mr. Lerner testified that the cucumbers were grades 1s, 2s and 3s; that he supervised the inspection and grading, and that the cucumbers were of a proper grade and in good condition when loaded. Charles Cohen, a member of plaintiffs' firm, testified that the cucumbers in this car were sold to Gold, Hoffman & Post, Inc., at Milwaukee; that he saw the car at Milwaukee the day after its arrival and before the cucumbers were unloaded; that he inspected the contents of the car; that "there were many covers upset and thrown all over the top; also many baskets squeezed on the north end of the car, the contents of

the cucumbers bruised. The contents of the car was shifted about ten or fifteen inches." The court admitted a copy of an invoice of the car to Gold, Hoffman & Post, Milwaukee. The invoice, dated May 11, 1935, showed 191 bushels at $1 a bushel, 212 bushels at 80 cents a bushel and 68 bushels at 60 cents a bushel, or a total of 471 bushels at $401.40. He further testified that Gold, Hoffman & Post refused to take the car, and that he then turned it over to them to sell "for our account." Gold, Hoffman & Post rendered an account as to the car, which account was admitted in evidence. The account showed the sale of 465 bushels at $520.85, from which was deducted a commission of $36.46, cartage of $18.60 and freight charges of $285.32, leaving a balance owing to plaintiffs of $180.47. Presumably these figures represented the prices for which the various bushels were sold separately to retailers, or other purchasers, in small lots. The witness claimed a loss on the car of $220.93, representing the difference between $401.40, which they were to receive from the consignee, and $180.47, which they did receive. The witness testified that he inspected about 125 bushels; that he did not know the value of the 125 bushels in their then condition. He also testified as to the market value of cucumbers in 1934. He did not testify as to the market value of cucumbers in 1935, which is the shipment covered by the second count. Plaintiffs introduced a certificate of inspection by an inspector of the U. S. Department of Agriculture. He inspected the car at Milwaukee on May 13, 1935 at 3:25 p. m. He found that the load was shifted and that three bushels were tipped on the sides and showed about half of the cucumbers spilled on the floor, that 27 bushels were "slightly to badly crushed," and also that "spilled cucumbers, also 5 to 15% contents of crushed baskets, noted above, are bruised or cut." It is stipulated that on May 14, 1935, the market quotations on cucumbers at Milwaukee showed "Texas bush-

els No. 1, $1.65, $1.75, Commercials $1.25 to $1.35.''
It was also stipulated that the original seals were
intact on arrival at Milwaukee. Clifford Derby, an
inspector for the Western Weighing and Inspection
Bureau, testified that he inspected the car and the
contents on May 14, 1935, and made a record of the
condition of the load. His record showed 44 baskets
slightly crushed, 10 to 20 per cent damage; two baskets
center bands broken, sides bulged out, 10 to 15 per
cent damage; two baskets badly crushed, 45 to 55 per
cent damage; six baskets half of contents spilled, 35
to 46 per cent damage, and that after the car was un-
loaded, one bushel was picked up and salvaged by em-
ployees. He testified that 465 baskets were unloaded
from the car, and that 56 baskets showed some damage;
that the balance of the baskets were in good shape; that
he inspected about one-quarter of the undamaged bas-
kets, and that he was able to say that the other three-
quarters of the undamaged baskets were in good con-
dition externally as they were going out of the car;
that he inspected every basket that went out of the
car. On cross-examination he testified that he looked
inside of about 100 baskets, in addition to the 56 dam-
aged baskets, and that he examined all of the baskets
externally; that the damage to the baskets was scat-
tered throughout the load, and that he did not know
''what effect on market value physical damage would
have.'' William F. Schabarth, a fruit and vegetable
inspector for the Western Weighing and Inspection
Bureau, testified that he did not inspect the car but
that he did receive the report, and that based on the
market value of $1.70 per bushel, the money damage
on the different packages was: 44 baskets, 15 per cent
damage, loss $11.22, 2 baskets, 12½ per cent, 42 cents;
2 baskets, 50 per cent, $1.70, 6 baskets, 28 per cent,
$3.84, making a total of $17.18, covering 54 baskets,
and that if 56 baskets were damaged, as testified to by
a witness, there would be a total damage of $18.88.

On cross-examination, he stated that he had never sold cucumbers but was on the market every day. Samuel Egalnick, a witness for plaintiffs, testified in rebuttal that he was in the produce business for 20 years, and that when baskets of cucumbers were physically damaged, the market value would be decreased to even a greater extent. However, on cross-examination, he admitted that if some baskets of cucumbers arrived in a damaged car and neither the baskets nor the cucumbers were damaged, the fact that other baskets in the same car arrived in a damaged condition would not affect the market value of the baskets that were in good condition, providing the buyer did not know that the good baskets arrived in a car that had been damaged. We have summarized all of the evidence offered in support of the second count. The evidence in the record shows that 56 baskets were damaged. Plaintiffs apparently are claiming the sum of $220.93, based on damage to the contents of the entire car. If the cucumbers were sold at auction or in some other manner to indicate that they all came out of a damaged car, it is possible that a buyer would offer a lower price because they came out of a damaged car. Here, apparently, the cucumbers were sold by the consignee to various retailers and others who purchased in small lots. There is nothing in the record to show that these buyers knew that the cucumbers came out of a damaged car. The evidence is that the cucumbers that were not damaged were in good condition. In the absence of a showing to the contrary, there is no reason why the cucumbers that were not damaged and which came out of a damaged car should have a lower market value than cucumbers which came out of an undamaged car.

Plaintiffs ask us to consider the distinction between physical damage and commercial damage, and that in calculating the loss sustained, such loss must be based on market values, and that the damage should be based on the difference between the fair and reasonable mar-

ket value of the commodity in good condition at the time and place of arrival, and the fair and reasonable market value of the commodity in the condition in which it did arrive. That statement is not challenged. However, in order to determine the condition in which the cucumbers arrived, it is necessary to determine the physical damage, as the market value of the damaged cucumbers is necessarily determined by the extent of the damage.

The cause of action set out in the first count is barred by the limitation provision in the bill of lading, and the only damage shown by the evidence supporting the second count is the sum of $18.88. For the reasons stated, the judgment of the municipal court of Chicago is reversed and judgment is entered here for the plaintiffs and against defendant in the sum of $18.88, with costs taxed against plaintiffs.

*Judgment reversed and judgment here for plaintiffs for $18.88 with costs taxed against plaintiffs.*

Denis E. Sullivan, P. J., and Hebel, J., concur.